LDA

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| OMNIPOINT COMMUNICATIONS, INC., A Wholly Owned Subsidiary of T-Mobile, USA, Inc.,<br>Plaintiff,<br>v.<br><br>THE CITY OF EAST PROVIDENCE, CITY OF EAST PROVIDENCE ZONING BOARD OF REVIEW and EUGENE SAVEORY, CHRISTOPHER SMITH, MICHAEL BEAUPARLANT, JOHN BRAGA, DONALD TURNER, MIKEL PERRY, and RICHARD CROKE in their Capacities as members of the CITY OF EAST PROVIDENCE ZONING BOARD OF REVIEW | Civil Action No.<br><br>CA 08 126 ML |

# COMPLAINT

## INTRODUCTION

This action arises out of the unlawful denial by the City of East Providence Zoning Board of Review (the "Board") of an application by Omnipoint Communications, Inc., a wholly owned subsidiary of T-Mobile USA, Inc., and doing business as ("T-Mobile") for use and dimensional variances under the City of East Providence Zoning Ordinance (the "Ordinance") to install, operate, and maintain a ninety foot (90') telecommunications monopole camouflaged as a fully functional flagpole (the "Flagpole"), together with equipment cabinets in a fenced compound at the base of the Flagpole (collectively, the "Facility"), to be located at property leased by T-Mobile at 2595 Pawtucket Avenue, East Providence (the "Property"). The Board's denial of T-Mobile's application for the requested relief violates § 704 of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c). Accordingly, T-Mobile seeks an injunction from this Court

directing the Board to grant T-Mobile's application for the use and dimensional variances in accordance with T-Mobile's rights under the Federal Telecommunications Act of 1996.

## THE PARTIES

1. Plaintiff, Omnipoint Communications, Inc., is a Delaware corporation with its principal place of business in Bellevue, Washington. Omnipoint Communications, Inc. is a wholly owned subsidiary of T-Mobile USA, Inc., a Delaware corporation with its principal place of business in Bellevue, Washington.. Both Omnipoint Communications, Inc. and T-Mobile USA, Inc., are registered to do business in the State of Rhode Island. Omnipoint and T-Mobile USA , Inc., maintain an office at 15 Commerce Way, Suite B, Norton, Massachusetts. Omnipoint Communications, Inc., operates a personal wireless service network in the New England area including Rhode Island and does business under the name T-Mobile. T-Mobile USA, Inc. is a national leader in providing Personal Communication Services ("PCS") to customers throughout the United States.

2. Defendant, the City of East Providence ("East Providence" or the "City") is a duly authorized municipality constituted and existing under the laws of the State of Rhode Island.

3. Defendant, the Board, is a duly authorized unit of the City that has been delegated the authority, among other things, to grant variances under the City's Zoning Ordinance.

4. Defendants Eugene Saveory, Christopher Smith, Michael Beauparlant, John Braga, and Donald Turner, served as the Board that denied the request for the use and dimensional variances at issue in this action. Defendants Mikel Perry and Richard Croke are members of the Board, but did not vote, and accordingly are named solely as a nominal parties. Each is named solely in his/her capacity as a Board member.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically § 704 of the Federal Telecommunications Act of 1996.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b), since the Defendants each reside in this District, and the events giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

### The Personal Communications Service Technology

7 T-Mobile USA, Inc. through directly or indirectly wholly owned subsidiaries is licensed by the FCC to provide both Personal Communications Services (PCS) and Advanced Wireless Services (AWS) across a national wireless network. T-Mobile USA provides personal wireless services across the country through wholly owned subsidiaries like Omnipoint Communications, Inc. PCS technology is a new generation of wireless service that uses digital transmission to improve the telecommunications services available to consumers.

8. Wireless telephone service is important to public safety and convenience. From 1996 to mid-2007, the number of wireless telephone users increased more than fivefold -- from 44 million to more than 243 million wireless subscribers. There are now more wireless subscriptions than landline telephone subscriptions in the United States. At present the number of landline telephone subscribers across the nation is declining each year while the number of wireless users increases.

9. For many Americans, cell phones have become an indispensable replacement for traditional landline telephones. Even when Americans maintain both types of telephone service, Americans are opting increasingly to use their cell phones over their landline telephones. From 1996 to 2004, Americans more than quadrupled their time spent talking on their cell phones,

while markedly reducing the number of long-distance and local calls made over conventional landlines. From 2001 to mid-2007 the number of minutes of use by wireless subscribers in the US increased more than five fold from less than 200 billion minutes of use per year to more than a trillion minutes of use.

10. For Americans living in "wireless-only" homes and for those others while away from their homes, cell phones are often their only lifeline in emergencies. Nearly thirty percent of adults ages 25-29 live in households with wireless service only. Between 1995 and 2006, the number of 911 calls made by people using wireless phones more than doubled, to over 50 million a year. Public safety agencies estimate that approximately 30% of the millions of 911 calls they receive daily are placed from cell phones, and the percentage is growing.

11. Unlike cellular services using analog-based systems, PCS digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This allows T-Mobile to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and imaging capabilities as well as voice mail, call forwarding and call waiting.

12. Mobile telephones using PCS technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to the Base Station Controller, subsequently routing the calls throughout the world.

13. The traditional analog cell phone carriers use spectrum in the 850 megahertz range while the newer PCS providers, like T-Mobile operate on PCS (1.9 gigahertz) and AWS (1.7 and 2.1 Gigahertz) frequency bands. Because a PCS system uses a lower signal strength and operates at a much higher frequency band than traditional analog cellular technology, the

acceptable signal strength range for reliable communications between a PCS mobile telephone and antennas is shorter than between a traditional analog signal and a cellular network operating at the 850 megahertz range.

14. To provide continuous service to a PCS telephone user, radio frequency coverage must overlap in a grid pattern resembling a honeycomb. In the event that T-Mobile is unable to construct a cell site within a specific geographic area, T-Mobile will not be able to provide service to consumers or travelers within that area.

15. T-Mobile's engineers use sophisticated computer programs and extensive field testing to complete a propagation study, which shows where cell sites need to be located to provide reliable wireless service. The propagation study also takes into account the topography of the land, the coverage boundaries of neighboring cells and other factors. For an entire PCS system to be operational, there must be properly placed cell sites installed and functioning so that seamless coverage can be realized, and only when the entire system is operational will a PCS telephone user have service and an uninterrupted conversation throughout a given territory. If there is no functioning cell site within a given area, there would be no PCS telephone service for customers within that area, and mobile customers who travel into the area will experience an unacceptable level of dropped calls.

16. Based upon T-Mobile's research and analysis, T-Mobile determined that it has a significant gap in its PCS coverage in this area of East Providence, and particularly the area in the vicinity of the Property, including the heavily traveled State Route 103, and that by constructing the proposed Facility on the Property it could provide PCS coverage to the targeted areas.

17. T-Mobile determined that, because of its central location within the gap in the coverage network, the Property's large size as compared to other properties in the area, thereby

allowing the Facility to substantially comply with the Ordinance's setback requirements, and unique topography, the Property provided the optimal site within East Providence to remedy its coverage gap and to provide coverage consistent with the dictates of its FCC license requirements.

18. T-Mobile has had a significant gap in coverage with respect to this section of the City, including State Route 103 and the surrounding populated areas, for several years and has explored a number of potential sites for a wireless telecommunications facility, without success, prior to its application for the instant necessary zoning relief.

19. T-Mobile determined that, because of its location, size, non-residential use, and the lack of other available and feasible locations, the Property provided the only feasible site within East Providence to remedy the coverage gap at issue and to provide coverage consistent with the dictates of its FCC license requirements.

**Federal Statutory Control Over PCS Siting**

20. Section 704 of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 332(c), governs federal, state and local government regulation of the siting of PCS facilities such as the one at issue here.

21. The Act further provides that any person adversely affected by a state or local government's act, or failure to act, that is inconsistent with § 332(c)(7) of the Act may seek expedited review in the federal courts. 47 U.S.C. § 332(c)(7)(B)(v).

**The Zoning Ordinance**

22. The Property is within the Residential 3 Zoning Districts as defined under the Ordinance. Under Section 19-98 (Schedule of Use Regulations) of the Ordinance, the use of the Property for a wireless communications facility is not permitted.

23. Under Section 19-353(b)(5)(a)(1), including "Table 1" to which it refers, a tower shall be setback from a "Single-family or duplex residential units" and/or "Vacant single-family or duplex residentially zoned land which is either platted or has preliminary subdivision plan approval which is not expired" by a distance of "200 feet or 300 percent height of tower whichever is greater" as "measured from the base of the tower to the lot line of the off-site uses and/or designated areas as specified in Table 1, except as otherwise provided in Table 1".

24. Accordingly, under the Ordinance, the ninety (90) foot proposed Flagpole was required to be located two hundred seventy (270) feet from each Property boundary line.

25. The Flagpole provided setbacks of one hundred eighty (180) feet to the left Property boundary, two hundred five (205) feet to the right Property boundary, and two hundred fifty (250) feet to the rear Property boundary.

26. Accordingly, T-Mobile sought a use variance to permit the proposed Facility within the Residential 3 Zoning District, as well as dimensional variances for the setback requirements.

27. Under Section 19-38(a)(3) of the Ordinance, the Board has the power to "authorize, upon application, in specific cases of hardship, variances in the application of the zoning ordinance, pursuant to the state statutes and section 19-40."

28. The Ordinance includes criteria consistent with R.I. Gen. Law 45-24-41, which provides that the Board may grant a variance when it finds that:

> (1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic

disability of the applicant, excepting those physical disabilities addressed in R.I. Gen. Law 45-24-30(16);

(2) That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;

(3) That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of the zoning ordinance or the comprehensive plan upon which the ordinance is based;

(4) That the relief to be granted is the least relief necessary; and

(5) In granting a use variance the subject land or structure cannot yield any beneficial use if it is required to conform to the provisions of the zoning ordinance. Nonconforming use of neighboring land or structures in the same district and permitted use of lands or structures in an adjacent district shall not be considered in granting a use variance; and

(6) In granting a dimensional variance, that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted is not grounds for relief.

**T-Mobile's Applications under the Zoning Ordinance &**

**Telecommunications Act of 1996**

29. On or about January 31, 2008, T-Mobile formally applied to the Board for the necessary use and dimensional variances pursuant to the Ordinance.

30. T-Mobile's application to the Board met all of the requirements of the Ordinance, R.I. Gen. Law 45-24-41, and the Act and for the issuance of the requested use and dimensional variances. Specifically, T-Mobile demonstrated, in its application:

a) The proposed Facility complied with the criteria for the grant of the requested use and dimensional variances from the provisions of the Ordinance;

b) a literal enforcement of the use and setback provisions of the Ordinance would prevent T-Mobile from eliminating an existing gap in its PCS coverage, resulting in a potential loss of subscribers and the inability to compete for subscribers with FCC licensed competitors in the market, contrary to the intent of the Ordinance and the Federal Telecommunications Act;

c) T-Mobile designed its Facility to conform to the existing shape and topography of the Property while minimizing potential adverse aesthetic impact;

d) the Property has unique topographical characteristics relative to other properties in its vicinity, as it is topographically higher than much of the area within the coverage objective, such that the locating the proposed Flagpole on the Property is necessary to rectify T-Mobile's coverage gap; and

e) the relief sought by T-Mobile could be granted without substantial detriment to the public good and without derogating from the intent or purpose of the Ordinance.

**The Board's Denial of T-Mobile's**

**Use and Dimensional Variance Application**

31. The Board held public hearings for T-Mobile's application on October 11, 2007 and October 13, 2007 (including a view of the Property).

32. At the hearings, the Board questioned:

a) whether T-Mobile was entitled to the zoning relief requested under the Ordinance;

b) whether T-Mobile had a significant gap in coverage;

c) whether there were existing structures within the City of East Providence from which T-Mobile's coverage gap could be rectified; and

d) whether there were other alternative properties from which T-Mobile's coverage gap could be rectified.

33. T-Mobile introduced evidence including radio frequency coverage maps which demonstrated that it has a significant gap in coverage in this area of East Providence.

34. At the hearing, T-Mobile introduced further evidence that the significant gap in coverage was located almost entirely within the City of East Providence and included State Route 103 and the surrounding heavily populated areas.

35. T-Mobile introduced written and oral evidence concerning its search for appropriate alternative sites and that no alternative sites were feasible.

36. T-Mobile introduced evidence which demonstrated that utilizing an existing water tank in East Providence was not available for T-Mobile's proposed use.

37. T-Mobile introduced evidence which demonstrated that existing utility stanchions were not feasible alternatives.

38. T-Mobile introduced evidence which provided that the City rejected its attempt to locate a wireless communications facility to provide adequate coverage to this significant gap in T-Mobile's network on City-owned property located at Kent Height Park, 2680 Pawtucket Avenue.

39. T-Mobile introduced evidence that the proposed Flagpole was one hundred and eighty (180) feet to the nearest Property boundary, which was a distance equal to two times the height of the proposed ninety (90) foot Flagpole. Accordingly, T-Mobile explained that even in the unlikely event of a complete failure of the Flagpole at the base, the Flagpole would remain entirely within the confines of the Property.

40. The Board requested no additional information regarding the T-Mobile's coverage gap, its need for variances, alternatives, or any other matter.

41. The Board voted 5-0 to deny the requested variances. The Board's decision was filed with the City Clerk's office on March 10, 2008. A true and accurate copy of the Board's decision is attached hereto as Exhibit A.

**COUNT I - TELECOMMUNICATIONS ACT OF 1996**
**(Substantial Evidence)**

42. T-Mobile hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

43. Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii): "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

44. T-Mobile has fulfilled all of the criteria required by the Act and Ordinance in order to receive the relief for which it applied.

45. Defendants have failed to meet their burden of producing substantial evidence in a written record supporting the Board's denial of T-Mobile's application.

45. In denying T-Mobile's request for use and dimensional variances, the Board ignored T-Mobile's need to close a significant gap in its coverage network.

47. In denying T-Mobile's requested zoning relief, the Board ignored the uncontroverted scientific evidence and testimony submitted by T-Mobile to substantiate its significant gap in coverage.

48. In denying T-Mobile's requested zoning relief, the Board ignored the uncontroverted written evidence and testimony submitted by T-Mobile demonstrating that no reasonably feasible alternative exists.

49. In denying T-Mobile's requested zoning relief, the Board incorrectly relied on its determination that a water tank within East Providence was not "properly pursue[d]" and represented a feasible alternative, as it specifically ignored the uncontroverted written and oral testimony demonstrating that the City had failed to make the water tank available for such use.

50. In denying T-Mobile's requested zoning relief, the Board improperly relied on opposition by members of the public including generalized concerns regarding aesthetics that cannot be a proper basis for a denial under the Act.

51. The Board's decision is not "supported by substantial evidence contained in a written record." 47 U.S.C. § 332 (c)(7)(B)(iii).

52. Consequently, the Board's action is in violation of, and preempted by, the Act and the Supremacy Clause, and should be set aside and enjoined by the Court on that basis. Further, this Court should exercise its power to issue an order commanding the Board to grant the variances for which T-Mobile applied.

**COUNT II - TELECOMMUNICATIONS ACT OF 1996**
**(Effective Prohibition)**

53. T-Mobile hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 52 above as if fully set forth herein.

54. Article VI, Clause 2, of the United States Constitution, commonly known as the Supremacy Clause, provides, in relevant part, that "[t]his Constitution and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

55. The Act governs the regulation of the placement, construction, and modification of personal wireless service facilities and, under the Supremacy Clause, preempts state laws and municipal ordinances or Ordinance affecting such facilities to the extent that such laws, ordinances, and Ordinance conflict with the Act.

56. T-Mobile's application for use and dimensional variances constitutes a request to provide "personal wireless services" within the meaning of the Act, and, as such, is entitled to the protection of the Act.

57. Pursuant to 47 U.S.C. § 332(c)(7)(B), the "regulation of the placement, construction and modification of personal wireless service facilities by any State or local government or instrumentality thereof ...(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services".

58. T-Mobile investigated alternative sites in and around the area of East Providence within which its engineers determined that a coverage gap exists and that a facility must be located to fill the gap in service coverage and to function effectively within T-Mobile's network of existing and planned facilities.

59. No property within which a wireless communications facility can be located is feasible to remedy the gap in T-Mobile's coverage.

60. The Board's denial of the zoning relief sought by T-Mobile, given the (i) lack of reasonably feasible alternatives in the area, (ii) Board's unfounded assertions concerning the detrimental impact including generalized aesthetic concerns that will be attendant to any new tower in the area, (iii) the Board's prior denial of a prior application to provide adequate coverage to this significant gap n T-Mobile's network, effectively prohibits T-Mobile from providing coverage to its current or potential subscribers.

61. A literal enforcement of the setback provisions of the Ordinance, together with denial of the zoning relief sought by T-Mobile, effectively prohibits T-Mobile from providing coverage to its current and future subscribers.

62. T-Mobile has established that the denial of its request for use and dimensional variances to permit the installation, operation, and maintenance of the proposed Facility would result in a significant gap in its provision of wireless communications services to its customers, (i) that there are no reasonably feasible alternative sites within the affected area of East Providence on or from which it may otherwise fill its significant gap in coverage, (ii) the Board's general opposition to the siting of a new tower in this area despite the lack of permitted areas in or near the significant gap in coverage in T-Mobile's network, the (iii) Board's unfounded assertions concerning the detrimental impact including generalized aesthetic concerns that will be attendant to any new tower in the area, renders any further applications for a site to cover this significant gap in T-Mobile's coverage network fruitless to attempt.

63. Consequently, the Board's denial of T-Mobile's application for use and dimensional variances violated the Act's requirement that state or local governments not prohibit or effectively prohibit the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(II)

**WHEREFORE**, T-Mobile respectfully requests the following relief against the defendants:

1. An expedited review of the matters set forth in this Complaint;

2. An injunction mandating that the Board grant approval of the use and dimensional variances for which T-Mobile applied;

3. An injunction and order of mandamus directing the City, through its officers and agents, to issue all ancillary permits, including, without limitation, the use and dimensional variances for which T-Mobile applied, as well as a building permit for construction of the Facility in the use and dimensional variance application that is the subject of this action;

4. A judgment that the Defendants' actions violated the Act and are therefore void and invalid;

5. An award of T-Mobile's costs of suit herein, including reasonable attorneys' fees; and

6. Such other and further relief as the Court may deem just and proper.

**OMNIPOINT COMMUNICATIONS, INC.**
A Wholly Owned Subsidiary of T-Mobile, USA, Inc.
By its attorneys,

Brian Grossman, R.I. Bar No. 7308
PRINCE, LOBEL, GLOVSKY & TYE LLP
100 Cambridge Street
Suite 2200
Boston, MA 02114
Telephone: (617) 456-8000
Fax: (617) 456-8100
Email: bgrossman@princelobel.com

Dated: April 9, 2008